UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID MCNAIR,

    Plaintiff,

v.

COLLIN PRATT, *et al*,

    Defendants.

Case No. 1:20-cv-63

Hon. Janet T. Neff

**REPORT AND RECOMMENDATION**

Plaintiff David McNair ("McNair") is a prisoner in the custody of the Michigan Department of Corrections (MDOC). Prisoner McNair, through counsel, filed this civil rights lawsuit alleging the use of excessive force. On initial screening, the Court dismissed all defendants except for Corrections Office (CO) Collin Pratt. This matter is now before the Court on CO Pratt's motion for summary judgment (ECF No. 47).[1]

    **I.**    **Plaintiff's complaint**

The alleged incidents occurred that the MDOC's Michigan Reformatory (RMI). The Court summarized McNair's allegations against CO Pratt as follows:

> Plaintiff alleges a series of connected events that occurred on June 11, 2019. First, Defendant Pratt used a racial slur against Plaintiff. Defendant Pratt then commanded Defendant to return to his unit. Plaintiff informed Defendant Pratt that he was headed to school and would return afterward. Defendant Pratt asked if Plaintiff was refusing, and Plaintiff denied refusing and stated that he would return to his unit as ordered.

---

[1] The Court notes that while defendant's counsel docketed this as a motion to dismiss (ECF No. 47), it is a motion for summary judgment.

1

>Defendant Pratt then detained and handcuffed Plaintiff, subsequently taking him to segregation. In the process, Defendant Pratt tightly squeezed Plaintiff's arm. Upon arriving in segregation, Defendant Pratt "slammed [Plaintiff's] face into a barred window," "pressed [Plaintiff's] face against the bars with his forearm behind [Plaintiff's] head," and "slam[med] [Plaintiff's] head on the cement floor causing serious injury to his face and head." (Compl., ECF No. 1, PageID.3-4.)

Opinion (ECF No. 3, PageID.14). "Immediately after the incident, Defendant Pratt "was escorted off the facility, placed on a stop work order, and eventually fired." *Id*. Plaintiff seeks compensatory damages, punitive damages, and attorney's fees. Upon initial review, the Court concluded that McNair's allegations were sufficient to state an Eighth Amendment claim against CO Pratt.

## II. CO Pratt's motion for summary judgment

### A. Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).

"In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B.   Eighth Amendment claim

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem*, Ohio, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

In screening the complaint, the Court set forth the legal standard applicable to McNair's Eighth Amendment claim:

> The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id*.

3

Generally, restrictions and even harsh conditions of confinement are not necessarily cruel and unusual punishment prohibited by the Eighth Amendment. *Rhodes*, 452 U.S. 347. The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37-39 (2010). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7; Wilkins, 559 U.S. at 37. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 6-7 (citing Whitley, 475 U.S. at 321); *accord Griffin v. Hardrick*, 604 F.3d 949, 953-54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990). Physical restraints are constitutionally permissible where there is penological justification for their use. *Rhodes*, 452 U.S. at 346; *Jones v. Toombs*, No. 95-1395, 1996 WL 67750, at *1 (6th Cir. Feb. 15, 1996); *Hayes v. Toombs*, No. 91-890, 1994 WL 28606, at * 1 (6th Cir. Feb. 1, 1994); *Rivers v. Pitcher*, No. 95-1167, 1995 WL 603313, at *2 (6th Cir. Oct. 12, 1995).

On occasion, "[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law." *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002) (citing *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)). Prison officials nonetheless violate the Eighth Amendment when their "offending conduct reflects an unnecessary and wanton infliction of pain." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (internal quotation marks omitted); *Bailey v. Golladay*, 421 F. App'x. 579, 582 (6th Cir. 2011). But not every shove or restraint gives rise to a constitutional violation. *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986).

There is an objective component and a subjective component to an Eighth Amendment claim of excessive force. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). First, "[t]he subjective component focuses on the state of mind of the prison officials." *Williams*, 631 F.3d at 383. We ask "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Second, "[t]he objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams*, 631 F.3d at 383 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This component requires a "contextual" investigation, one that is "responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S. at 8, (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). While the extent of a prisoner's injury may help determine

4

> the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident." *Hudson*, 503 U.S. at 9. "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id*.

Opinion at PageID.17-19.

### C.   CO Pratt's evidence

CO Pratt contends that his actions did not violate McNair's Eighth Amendment rights. First, Pratt contends that he used MDOC-approved techniques in a good-faith effort to maintain or restore discipline because McNair disobeyed multiple direct orders, physically resisted segregation, used vulgar profanities, and made threatening remarks towards him. Defendant's Brief (ECF No. 47, PageID.257-266). Second, Pratt contends that he is entitled to qualified immunity because even if McNair could prove a constitutional violation, it was not clearly established that an officer violates the Eighth Amendment when he uses MDOC-approved techniques to control a prisoner who disobeys multiple direct orders, physically resists segregation, uses vulgar profanities, and makes threatening remarks towards the officer. *Id*. at PageID.266-268.

CO Pratt set out a lengthy recitation of facts, which is supported by McNair's Deposition Testimony (Exhibit A, ECF No. 47-1), Pratt's Deposition Testimony (Exhibit B, ECF No. 47-2), the MDOC Critical Incident Report (Exhibit C, ECF No. 47-3), and CO Herrara's Statement (Exhibit D, ECF No. 47-4). Pratt's recitation is set forth below.

#### 1.   Prisoner McNair's obscenities and arguments directed at CO Herrara which precipitated CO Pratt's involvement

> As a yard officer, Officer Pratt's job duties included observing mass movement of prisoners around the facility and watching Level IV prisoners on the yard. On the date of the incident, Officer Pratt was with other officers standing on the yard,

5

which is gated in and surrounded by a walkway where prisoners move about the facility. Prisoners started to move about the premises when the Level IV prisoners were called for school. The school is located across the facility from the yard.

Plaintiff admittedly shouted at another prisoner who was on the yard through the fencing which is a violation of MDOC prisoner rules and regulations, a Class 3 form of misconduct. As a result, another officer, Officer Jose Herrera, engaged Plaintiff through the fence and ordered him to stop yelling and just keep walking. However, Plaintiff continued to exchange words and yelled back: "This is my house," "I own this place," "you work for me, nxxxa." After Plaintiff made this derogatory remark, Officer Herrera ordered Plaintiff to provide his identification and asked him what he said. Additionally, Officer Herrera ordered the other prisoner that Plaintiff had shouted at to return to his unit.

As Officer Herrera attempted to remove the other prisoner, Plaintiff continued to yell vulgar obscenities towards Officer Herrera. Officer Herrera approached Plaintiff and stated that he would not tolerate Plaintiff's language or behavior. Undeterred, Plaintiff continued to yell obscenities towards Officer Herrera and moved within a few feet of him. At this point, Officer Pratt was still on the other side of the gate, roughly 20 to 25 feet away from Officer Herrera and Plaintiff. When Plaintiff and Officer Herrera started arguing, Officer Pratt intervened to relieve the situation. This was the first and only interaction Officer Pratt ever had with Plaintiff.

Defendant's Brief (ECF No. 47, PageID.247-248) (internal citations and footnotes omitted).

### 2. Prisoner McNair refused to obey orders from CO Pratt

Officer Pratt gave Plaintiff three direct orders to return to his unit. Officer Pratt ordered Plaintiff to return to his unit immediately, but Plaintiff did not yield. Officer Pratt repeated the order and commanded Plaintiff to return to his unit, but Plaintiff admittedly responded with vulgarities and disobeyed this direct order. In fact, in his Complaint, Plaintiff admits that he "responded that he was going to school and would return to his unit after school." Officer Pratt repeated the order and commanded Plaintiff to return to his unit a third time, but Plaintiff once again disobeyed the order.

Even though Officer Pratt ordered Plaintiff to return to his unit three times, Plaintiff admittedly never obeyed these direct orders. At his deposition, Plaintiff testified that "if [Officer Pratt] would have told me again, said go back or you're getting a DDO" (disobeying direct order), then "I would have went back to my room" as Officer Pratt had ordered. However, rather than return to his unit as repeatedly ordered, Plaintiff remained in place and continued his demand to go to school before he went back to the unit as ordered. Generally, an inmate who

6

disobeys a direct order ("DDO") commits a Class 2 form of misconduct. However, when an inmate disobeys a direct order to return to his cell, it becomes a Class 1 form of misconduct which automatically requires the inmate to be placed in segregation. Because Plaintiff disobeyed multiple direct orders to return to his unit, Officer Pratt handcuffed Plaintiff and proceeded to move him to segregation.

*Id*. at PageID.248-249 (internal citations and footnotes omitted).

### 3. CO Pratt's use of force against McNair

Pursuant to MDOC policy, Officer Pratt grabbed Plaintiff's arm and held it firmly to exercise control as they walked to segregation. At this point, Plaintiff admits that he repeatedly used profanities towards Officer Pratt. Specifically, Plaintiff made several obscene and threatening remarks towards Officer Pratt: "bxxxh, I'm big blood. I'm kill you. I'll kill you and your family. You don't know who you're fxxxing with." Plaintiff talked about "being a blood, about being a killer, about he'll do the same" to Officer Pratt. Officer Pratt ordered Plaintiff to stop with the threatening remarks and just keep walking towards segregation.

In response, Plaintiff turned towards Officer Pratt, raised his shoulder and elbow to pull away from Officer Pratt, and told Officer Pratt to let go of him. MDOC prisoner rules and regulations prohibit prisoners from turning, moving, or pulling away from staff while being escorted about the premises. Therefore, Officer Pratt gave a loud verbal order to Plaintiff to not resist or attempt to pull away again. Nevertheless, Plaintiff continued to actively resist and said: "Imma beat your ass tough guy, you ain't shxt." Plaintiff admits that Officer Pratt warned that he may use force if Plaintiff continued to disobey orders, use vulgar profanities, and attempt to resist or pull away. Despite this clear warning, Plaintiff responded: "fxxk you[,] I'll do what I want[,]" and pulled away a second time as they neared the segregation door.

Officer Pratt had to get his key to enter the segregation door. To gain control of Plaintiff, who had now attempted to pull away twice, Officer Pratt used force to place Plaintiff against the bars outside the segregation door and ordered him to stop resisting once again. However, Plaintiff continued to resist, using his body weight, head, and shoulders to turn, lean back, and push Officer Pratt. Therefore, Officer Pratt put his left arm across the back of Plaintiff's shoulder blades in an attempt to gain control.

At this point, Officer Pratt yelled out for help twice because his radio had come undone from his chest as he attempted to gain compliance from Plaintiff. Several officers heard Officer Pratt yell for help and order Plaintiff to "stop resisting" and "stop pulling" multiple times. Plaintiff continued to hurl threats and obscenities towards Officer Pratt: "Ain't no help coming, Imma slap the shxt outta

7

you," "I'm gonna slap you. Let go of me. Bxxxh, I'm gonna kill you."    Again, Officer Pratt continued to give loud verbal orders to Plaintiff to stop resisting.

Despite Officer Pratt's direct orders to comply and pleas for assistance, Plaintiff continued to resist and escalated the situation.  Plaintiff turned towards Officer Pratt and made a hacking sound in preparation to spit at him.  Because Plaintiff continued to physically resist and indicated his intent to escalate the situation, Officer Pratt attempted to use an MDOC-approved straight arm bar takedown in an effort to gain control.   However, Plaintiff planted his feet, widened his base, and braced to resist the takedown. Plaintiff then stood up and actively resisted the takedown further before Officer Pratt was finally able to grab Plaintiff by the waist and get him down on the ground.

Once Plaintiff was on the ground, Officer Pratt put Plaintiff into a four-point restraint which is an MDOC-approved technique to gain compliance from a prisoner when they are on the ground.   At this point, Officers Andrew Higgins and Daniel Sprague came down from the upstairs housing unit, and Officer Jacob Clark came out of the segregation unit.   Several other officers and supervisors had to assist in an effort to gain compliance from Plaintiff.   While on the ground, Plaintiff continued to resist, use profanities, and threaten the officers saying "fxck you," "I'm gonna kill you."   Plaintiff admitted that he "was talking shxt" throughout the encounter.   Because Plaintiff continued to resist, the officers had to place Plaintiff in handcuffs, a belly chain, and leg restraints to gain control.

*Id*. at PageID.249-251 (internal citations omitted).

### 4.    McNair's treatment at healthcare

After the officers finally gained control of Plaintiff, they took him to the healthcare unit because he had a minor laceration on his head.   Plaintiff's medical visit admittedly "wasn't long at all."   It took the medical staff only about fifteen minutes to examine Plaintiff's alleged injuries.    The medical staff did not provide any treatment as a result of their initial examination, aside from a simple band-aid. Plaintiff returned to the healthcare unit two or three days after the incident.   At that time, Plaintiff complained about pain in his legs.   The medical staff thus performed another examination.   Once again, the medical staff did not provide any treatment for Plaintiff's alleged injuries.   The medical staff determined that Plaintiff simply had to "work out" his legs.   Plaintiff took some over-the-counter pills and did not seek any further medical treatment after that visit.   Plaintiff received five days of detention in segregation for disobeying Officer Pratt's multiple direct orders to return to his housing unit.   Plaintiff was never returned to the general population after this incident.

*Id*. at PageID.251-252 (internal citations omitted).

8

### D.      Prisoner McNair's Response

Prisoner McNair does not dispute CO Pratt's recitation of facts.   Prisoner McNair filed a short response (ECF No. 48, PageID.344-349) raising two pieces of "pertinent evidence."

### 1.      CO Pratt intended to slam McNair's face on concrete

First, McNair contends that "Plaintiff's claim that he was slammed on his face and had his head split open is about as clear-cut an eighth amendment violation as there can be." Plaintiff's Brief (ECF No. 48, PageID.347).   McNair bases this contention on his testimony[2]:

> Q    Can you kind of describe for me what -- describe for me what you remember?
>
> A    I was on my way to school, and I was talking to somebody that was on the yard.   Then Mr. Pratt said I called him the N word, and I told him I wasn't talking to him.
>
> Then he told me to go back to my unit.  I said I have to go to school, because if you don't go to school at MR and they're like you ain't got no note of them saying go back to your room or nothing saying that no officer told you go back to your room, they'll write you up.   That's what I was trying to explain to him.
>
> He told me -- he told me to cuff up, go to segregation, so we do that. I cuffed up and we was walking to segregation.   We was walking -- when we was walking through the hallway like right outside segregation, he was squeezing my arm.   I said I don't need you to squeeze my arm.   You ain't got to show me your strength. You ain't got to squeeze my arm.
>
> <u>He said the camera ain't going to show me squeezing your arm.   I said I don't care what the camera shows.   I don't want you -- I don't want you squeezing my arm.   He smacked my head through the -- through the cell bars and then says shut the fuck up before I make you kiss concrete. And then I told him fuck him, and then he did what he promised.</u>
>
> Q    <u>Meaning what?</u>

---

[2] The Court underlined the phrases upon which McNair quoted in his response.

> A <u>He was going to make me kiss concrete.   He slammed me on my face and he split my head open.</u>  Then they put me on -- they put me in handcuffs.   They put me in -- they put the belly chain around me and all that, putting the chains on my legs, twisted my legs all up as if I was going to ride out that day, but they was just cuffing me up like that to take me to seg.
>
> I went to medical.   That was that.   I went to medical and then he took me to segregation.   Then I got five days [detention] for not going back to my room for a DDO [disobeying a direct order].

McNair Dep. (ECF No. 47-1, PageID.274-275) (emphasis added).

### 2. The MDOC found CO Pratt guilty "for use of force"

Second, McNair contends that CO Pratt's argument "that he was following approved techniques is ludicrous" because he was found guilty of violating the policies and admitted it under oath.   McNair relies on Pratt's testimony regarding the disciplinary notes which he brought to his deposition[3]:

> Q. Okay. And how many pages of notes would you say that is?
>
> A. I believe the disciplinary is over 80 page.
>
> Q. Okay.  So you have over 80 pages of notes.
>
> A. I believe so, yes .
>
> Q. Okay.   And what is included in those 80 page, please?
>
> A . It's the disciplinary, the actual MDOC findings and then a copy of the use of force policy.
>
> Q. Okay.   So it's not just notes.   Well, what else is in there other than notes, please, if you can just itemize the documents that are contained in that 80-page file?
>
> A. The disciplinary and a copy of the use of force policy 0405.
>
> Q. What is the disciplinary?   I think I heard you say disciplinary. Is that what you said?

---

[3] The Court underlined the phrases upon which McNair quoted in his response.

> A. Yes.
>
> Q. What is disciplinary?
>
> A. The disciplinary packet, investigation packet that included the investigation of the incident.
>
> Q. And what was the conclusion of the investigation, if I may ask, please?
>
> A. <u>They found sufficient evidence of five findings for use of force and a couple other conducts unbecoming and found me guilty of it</u>.

Pratt Dep. (ECF No. 47-2, PageID.292) (emphasis added).[4]

### E. Discussion

CO Pratt contends that he is entitled to summary judgment because (1) no constitutional violation occurred, and (2) he is entitled to qualified immunity because it was not clearly-established that an officer violates the Eighth Amendment when he uses MDOC-approved techniques to control a prisoner who disobeys multiple direct orders, physically resists segregation, uses vulgar profanities, and makes threatening remarks towards the officer.

#### 1. Constitutional violation

Based on this record, the Court concludes that genuine issues of material fact exist as to whether CO Pratt violated Prisoner McNair's Eighth Amendment rights by engaging in the unnecessary and wanton infliction of pain. With respect to the objective component of the Eighth Amendment claim, there is no evidence to support McNair's characterization of his injury as

---

[4] The Court notes that McNair's counsel included a thumb drive with the Judge's copy of his response. Plaintiff makes a cursory reference to "Exhibit 1" and videos on the thumb drive. This thumb drive is not before the Court. Plaintiff's counsel did not file this thumb drive as an exhibit, did not provide a copy of the thumb drive to the Clerk's Office, and did not file a proof of service for the exhibit.

11

having his head "split open."  He was given band aids for a minor laceration on the head.[5] However, it is undisputed that McNair suffered some injuries and was treated at healthcare on more than one occasion.  Next, with respect to the subjective component of the Eighth Amendment claim, McNair testified that CO Pratt threatened to make McNair "kiss concrete" and then Pratt "slammed me on my face."  Such a statement would be evidence that Pratt intended to cause McNair harm rather than applying force in a good-faith effort to restore order.

When viewed in the light most favorable to prisoner McNair, the evidence supports an Eighth Amendment claim.  CO Pratt's conduct meets both the subjective component (Pratt applied force maliciously and sadistically to cause harm) and the objective component (Pratt inflicted pain which was sufficiently serious).  Accordingly, CO Pratt's motion for summary judgment should be denied on this basis.

### 2. Qualified immunity

CO Pratt also seeks summary judgment based on the affirmative defense of qualified immunity. Under this defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make

---

[5] McNair testified that he was bleeding from the middle of his forehead.  *See* McNair Dep. at PageID.277. When asked, "Did they have to give you any stitches or staples for the wound on your forehead?", McNair responded "Just Band-Aids, nothing but Band-Aids."  *Id*.

reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

The existence of the qualified immunity inquiry involves two questions: whether the defendant violated a constitutional right and whether that right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016). "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Id*. When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

Here, CO Pratt's motion for summary judgment on the basis of qualified immunity fails. As discussed, genuine issues of material fact exist as to whether Pratt violated McNair's Eighth Amendment rights. Similarly, a genuine issue of material fact exists as to whether Pratt properly used MDOC-approved techniques to maintain control over McNair. As discussed, Pratt was found guilty of violating some of the MDOC policies regarding use of force. That being said, it is unclear from the parties' briefs exactly which policies were relevant to Pratt's interaction with McNair and which policies Pratt was found guilty of violating. "Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Accordingly, the Court should deny CO Pratt's motion for summary judgment.

### III. Recommendation

Accordingly, I respectfully recommend that defendant CO Pratt's motion for summary judgment (ECF No. 47) be **DENIED** and that this case proceed to trial.

Dated: February 2, 2024                     /s/ Ray Kent
                                            RAY KENT
                                            United States Magistrate Judge

**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).